63.     In November 2007, agents of Plaintiff reviewed Defendants' business practices and did not require any changes to practices then in place for the sale of used software.  For details of Plaintiff's meeting with Defendants see the Affidavit of John A. Linton, paragraphs 4-15.

64.     To date, L&Y remains a validly licensed authorized Microsoft OEM System Builder.

65.     In accordance with the Microsoft OEM System Builder License (paragraph 9), Defendants' liability is limited to the purchase price paid by its customer.

66.     A copy of the Microsoft OEM System Builder License is attached as an exhibit to the Affidavit of John A. Linton.

THIRD AFFIRMATIVE DEFENSE - END-USER LICENSE

67.     Defendants sold software licenses to Plaintiff's employees and/or agents, the individuals claiming to be Mr. Reid O'Neil and Mr. Richard Logue, respectively, subject to end-user license agreements.

68.     In accordance with the END-USER LICENSE AGREEMENT (paragraphs 16, 17, 18 and 19), Defendants' liability is limited to the purchase price paid by its customer.

69.     A copy of the END-USER LICENSE AGREEMENT is attached as an exhibit to the Affidavit of John A. Linton.

FOURTH AFFIRMATIVE DEFENSE - COPYRIGHT MISUSE

70.     Plaintiff has misused and continues to misuse its copyrights in the product known as Office Pro 2003.

71.     In *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (C.A.4 (N.C.), 1990), the Court of Appeals for the Fourth Circuit pioneered the expansion of the defense of patent misuse

to copyright. The *Lasercomb* court reasoned, "We are of the view, however, that since copyright and patent law serve parallel public interests, a 'misuse' defense should apply to infringement actions brought to vindicate either right." (*Lasercomb* at 911 F.2d 976). Other circuits, including the Ninth Circuit, have recognized these expanded intellectual property law misuse defenses.

72.     Upon information and belief, Plaintiff stopped producing its product known as Office Pro 2003 in November 2006 (See the attached BBC News Article dated November 20, 2006). In its place, Plaintiff began producing and marketing Office Small Business 2007, Office Professional Edition 2007, and Office Ultimate 2007 (collectively "Office 2007"). As of the date of filing this lawsuit, Plaintiff has completely abandoned Office Pro 2003. Further, Plaintiff has secreted the source code and has refused to license or permit others to produce and license Office Pro 2003.

73.     Many users find the use of Office 2007 products to be inferior to Office Pro 2003 (See the attached article from David Radin published in the Pittsburgh Post-Gazette on March 29, 2008). Switching to Office 2007 degrades the speed and performance of most computer systems. Many computer systems are inadequate to run Office 2007. Plaintiff in its "Technology Guarantee for 2007 Microsoft Office suites" admits that Office 2007 is designed for computers having as a minimum Windows XP with service pack 2 or later, 500 mHz processor clock speed, 256 million bytes of random access memory and 2 billion bytes of available hard disc space. In addition to these problems the purchase cost, training, installation, and support of Office 2007 is significantly higher. As a result, many members of the public and small businesses prefer not converting to Office 2007.

74.     Plaintiff has filed numerous lawsuits throughout the country in an effort to deter resellers from offering Office Pro 2003 in addition to forcing the end user into purchasing Office 2007 and not purchasing used software licenses. This suit is one of twelve such suits filed on June 9, 2008. Because Office Pro 2003 is only available as a used product, these lawsuits

negatively affect the public and Plaintiff's prior customers.  In addition, Plaintiff's attacks against the software resale market result in asset value depreciation amongst businesses seeking to sell Office Pro 2003 while such businesses convert to new computers with Office 2007.  In order to recoup any of their investment in Office Pro 2003 licenses, businesses use the license to obtain the "upgrade" price discount Plaintiff offers on Office 2007 products.  Plaintiff's conduct is improper when it prevents legitimate resale of its products and forces owners of its abandoned products to upgrade to its products for a price incentive that it monopolizes and controls.

75.     Copyrights are both a privilege and a duty:

The grant to the [author] of the special privilege of a [copyright] carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful Arts, by securing for limited Times to [Authors] ... the exclusive Right ..." to their ["original" works]. United States Constitution, Art. I, Sec. 8, cl. 8, [17 U.S.C.A. Sec. 102]. But the public policy which includes [original works] within the granted monopoly excludes from it all that is not embraced in the [original expression]. It equally forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant.

See *Lasercomb*, 911 F.2d 970 at 977 quoting *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942).

76.     Under United States Copyright law, complete resale of copyrighted products is permitted provided that the product is not transferred "by rental, lease or lending, or by any other act or practice in the nature of rental, lease or lending."  See 17 U.S.C. 109(a).

77.     It is violative of the public policy of United States Copyrights to remove and secret copyrighted material from the public.  Notwithstanding, this fact, Plaintiff's conduct in the mass filing of this and other lawsuits regarding an abandoned product restricts public access to the dissemination of such original works.  Plaintiff prevents the public from obtaining Office Pro 2003 from Plaintiff and Plaintiff's agents.  The public has no recourse but to seek used copies of Office Pro 2003 in the marketplace.  As a result, any resale and/or purchase of used Office Pro

2003 expose the reseller and/or purchaser to infringement litigation.

78.     Plaintiff has filed this lawsuit not in an effort to direct purchases of Office Pro 2003 to itself but rather to prevent lawful resale between innocent parties.  The fact that Plaintiff no longer produces Office Pro 2003 is strong evidence of Plaintiff's intent and callous disregard of the public's right of repurchase.

79.     Plaintiff is attempting to use its copyrights in a manner adverse to the public policy embodied in copyright law.

FIFTH AFFIRMATIVE DEFENSE - TRADEMARK MISUSE

80.     Following the *Lasercomb* rationale and precedent in addition to considering Plaintiff's wrongful conduct and the unique facts and circumstances of this case, Defendants contend that a misuse defense should be further expanded to include trademarks.

81.     Plaintiff is attempting to use its trademarks in a manner adverse to the public policy embodied in trademark law.  Plaintiff is asserting trademark infringement in its attempt to stymie the used software marketplace.

82.     Plaintiff does not claim trademark dilution caused by inferior products that are not performing as well as Plaintiff's produced products.  Instead Plaintiff complains of counterfeited versions of an abandoned product line in which Plaintiff has no longer a financial stake or interest.  Counterfeiting an equal or superior product does not damage Plaintiff's reputation.  An exact counterfeit does not confuse the public because the underlying source of the product remains with the Plaintiff.  Having received a positive impression of how Plaintiff's abandoned product functions (even if from counterfeit software), it is to Plaintiff's benefit that owners of the abandoned software will seek to upgrade with Plaintiff's current products instead of an alternative product.

83.     Plaintiff is misusing the claim of trademark infringement in its attempt to chill the

used software market.  Unlike new software, abandoned and used software products lack any claim as to the source of the software.  For abandoned software there can be no confusion in the public as to the source of the software because the public knows it does not come from the producer, which abandoned its production.  For used software there can be no confusion in the public as to the source of the software because the public knows it is being resold and does not come from a producer which does not sell used software.

84.     Absent trademark dilution, it is a misuse of trademark law to file suit in an effort to prevent legitimate and proper resale of a product Plaintiff abandoned and is no longer producing.

SIXTH AFFIRMATIVE DEFENSE - TRADEMARK ABANDONMENT

85.     A trademark or service mark is deemed abandoned when its use has been discontinued with intent not to resume such use.  Intent not to resume can be noted by the express intent of the mark holder or inferred from circumstances.  To remain in use, the mark must be used in the ordinary course of trade and not merely to reserve a right in a mark.  See, 15 U.S.C. § 1127.

86.     Plaintiff has abandoned its trademarks as related to the products known as Office Pro 2003.  Plaintiff no longer produces Office Pro 2003.  In news releases Plaintiff has publicized and expressed its abandonment of the product along with its intent to not resume production.

87.     Defendants assert the defense of trademark abandonment pursuant to 15 U.S.C. § 1115 (b) (2).

SEVENTH AFFIRMATIVE DEFENSE - GENERICNESS

88.     Plaintiff's WINDOWS trademark is invalid as generic. This mark has been adjudicated to be an unprotectable, generic term.  See the attached relevant orders of the United

States District Court for the Western District of Washington in the matter styled *Microsoft Corp. v. Lindows.com, Inc.*, Case Number 2:01-cv-02115-JCC, (W.D. Wash., 2002); 2:01-cv-02115-JCC docket items number 64 and 72.

### EIGHTH AFFIRMATIVE DEFENSE - ANTITRUST LAW VIOLATIONS

89.     Plaintiff sells its products to competitors of L&Y at prices that substantially lessen competition and create a monopoly in sales of Plaintiff's products.  L&Y is refused pricing discounts from Plaintiff commensurate with its status as an authorized seller of Plaintiff's products.  Plaintiff's pricing is not commensurate with differences in costs of manufacture, sale or delivery methods for quantity discounts given to competitors.  As a result Plaintiff is in violation of antitrust laws.

90.     As a result of Plaintiff's monopolistic conduct and violation of the applicable antitrust law, L&Y is forced to purchase for resale most of Plaintiff's products from its competitors.  For example, Office 2007 is purchased at a lower price from Dell Computers at retail than from D&H Distributing, Co. at wholesale.

91.     Defendants assert the defense of antitrust violation pursuant to 15 U.S.C. § 1115 (b) (7).

### NINTH AFFIRMATIVE DEFENSE - UNCLEAN HANDS

92.     Plaintiff's conduct in March 2007, April and May 2008 were fraudulent and deceptive.  Plaintiff's agents did not identify themselves or allow Defendants the opportunity to assist Plaintiff in locating sources of counterfeit software.  Plaintiff has no basis to suspect Defendants would refuse to cooperate in Plaintiff's efforts to prevent the sale of counterfeit software.  In fact, Plaintiff after meeting with Defendants in November 2007 knew or should have known that Defendants sought to aid Plaintiff in removing infringing software from the marketplace.