IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DISTRICT JUDGE GERALD BRUCE LEE
MAGISTRATE JUDGE JOHN F. ANDERSON

| | |
|---|---|
| MICROSOFT CORPORATION | : |
| *Plaintiff*, | : |
| | : CASE NO. 1:08cv00596-GBL-JFA |
| v. | : |
| L & Y ELECTRONICS, INC., | : |
| JOHN A. LINTON, and | : |
| SANGSOON LINTON | : |
| *Defendants.* | : |

## AFFIDAVIT OF MATTHEW LINTON

I, Matthew Linton, am over the age of eighteen (18), am competent to testify and have personal knowledge of the matters described in this Affidavit.

1. I am an employee of L & Y ELECTRONICS, INC. ("L&Y"). My duties at L&Y include providing customer service, manufacturing computer systems, installing custom and standard software, demonstrating computer and software features, repairing computers and answering customer questions. I have over 20 years experience in manufacturing personal computer systems.

2. On April 22, 2008 an individual calling himself Mr. Reid O'Neil entered our retail operations center and requested two custom manufactured computers. I, in my role as employee of L&Y, was the primary contact for Mr. O'Neil. I took his order (See Service Request I 7149, dated 04/22/08), manufactured the computers, installed the software and delivered the computers to Mr. O'Neil.

3. Mr. O'Neil appeared to be between 25 and 35 years old, of slim build, clean-shaven and was not wearing glasses.

4. Mr. O'Neil made unusual requests when placing his order for the computers. Mr. O'Neil stated that he wanted custom manufactured computers and went through the specifications. I told Mr. O'Neil that the cost of factory built, comparable Dell computers with the same specifications would be one half as much as custom manufactured computers. Mr. O'Neil said that his business partner was suspicious of factory built computers and would only accept custom manufactured computers. The specifications Mr. O'Neil required did not include any special or unique features and would have been easily satisfied by a factory built Dell computer. I suggested to Mr. O'Neil that he review this decision with his business partner. Mr. O'Neil insisted that he would only accept custom manufactured computers.

5. When I asked Mr. O'Neil for his contact information, he refused to identify his address. Mr. O'Neil explained that he and his business partner had just moved into their offices and he didn't know the address. Mr. O'Neil was also unable to give me the phone number for his office. The only contact information Mr. O'Neil gave was a cell phone number: 571-296-6180.

6. Mr. O'Neil wanted to obtain the manufactured computers as soon as possible and ordered and paid for expedited labor services. We charge a 25% premium for expedited labor, and I explained this to Mr. O'Neil. What struck me as unusual about Mr. O'Neil's request was that the software for the computers needed to be ordered and would not be available for immediate installation once the computers had been physically assembled.

7. Mr. O'Neil wanted each computer to have Microsoft Windows XP Professional operating system along with Microsoft Office Professional Edition 2003 ("Office Pro 2003"). L&Y sold the Windows operating software copies to Mr. O'Neil at a price of $150.00 per computer ($300.00 total). They were purchased from D&H Distributing Co.

("D&H") at a cost of $135.67 plus shipping each (See D&H Invoice 17940938 dated 12/28/07). L&Y realized gross receipts for each of the Windows XP of less than $14.00 (less than $28.00 total).

8. It was very difficult to obtain the Office Pro 2003 copies specifically ordered by Mr. O'Neil. I first checked with our customary Microsoft distributor D&H. D&H's online inventory indicated it did not have any copies of Office Pro 2003 in stock. Upon information and belief, D&H stopped providing Office Pro 2003 products in spring 2007.

9. I discussed this issue with Mr. O'Neil, particularly since he was in a rush for the custom manufactured computers. I offered comparable software in our current inventory of used software that included Microsoft Office 1997, Microsoft Office 2000, and Microsoft Office XP. I also told Mr. O'Neil that I could readily provide new copies of Microsoft Office 2007. Mr. O'Neil insisted that he wanted copies of Office Pro 2003. Before conceding to his request, I told Mr. O'Neil I could not make any assurances as to when L&Y would be able to procure a copy of Office Pro 2003. I further indicated that if L&Y did get such a copy, Mr. O'Neil would be purchasing used software. Mr. O'Neil continued to insist upon Office Pro 2003 and agreed to accept used copies of the software.

10. After the above exchange and against my suggestion of purchasing readily available products, Mr. O'Neil placed his order and gave me a $600.00 cash deposit (See L&Y Electronics Invoice Service 173).

11. On April 24, 2008 (2 days after the order was placed) I had completed manufacturing the computers and installing the Windows XP Professional operating software. I called Mr. O'Neil to tell him the computers were ready except for Office Pro 2003. I offered alternatives including providing the computers and a different office productivity suite or contacting him when Office Pro 2003 became available.

12. About a week later Mr. O'Neil stopped by the store. I asked him if he wanted to take the computers, as they were ready. He said he would wait for us to obtain the requested used copies of Office Pro 2003 before picking them up.

13. In early May 2008, a customer sold us an extra copy of Office Pro 2003 that he had purchased from Dell Computer. The software package was unopened. A Microsoft certificate of authenticity appearing in all respects to be genuine was in the package. The Microsoft security key was marked on a label that was affixed to the outside of the package. The disk appeared to be a genuine disk from Dell Computer and it had the holographic printing on the face of the disk that I check for as part of L&Y procedures. I installed this first copy of Office Pro 2003 on one of the computers. The software appeared to install normally without any error messages. I then hooked this computer up to the Internet and went through Microsoft's activation and validation of the Office Pro 2003 software. The Microsoft activation server accepted the security key and at the end indicated the software had been validated and properly installed and activated.

14. To obtain another copy of Office Pro 2003, I placed an order on Amazon.com (See Amazon Final Details For Order #104-7549351-0991416 dated May 9, 2008). A registered Amazon.com seller identified as "MR_Odowd" sold this copy of the software. In checking this seller's Amazon.com profile, there wasn't any indication that this seller had previously sold any non-genuine software products.

15. This second copy of Office Pro 2003 arrived shortly after May 16, 2008. I inspected the software. The software package was unopened. A Microsoft certificate of authenticity appearing in all respects to be genuine was in the package. The Microsoft security key was marked on a label that was affixed to the outside of the package. The disk appeared to be a genuine disk from Microsoft and it had the holographic printing on the face of the disk that I check for according to L&Y procedures. I installed this second copy of

Office Pro 2003 on the second of the computers. The software appeared to install normally without any error messages. I then hooked this second computer up to the Internet and went through Microsoft's activation and validation process for the Office Pro 2003 software. The Microsoft activation server accepted the security key and at the end indicated the software had been validated and properly installed and activated.

16. After installing and activating Office Pro 2003, I tried to notify Mr. O'Neil that the computers were ready. When I attempted to call him, no one would answer the telephone and there wasn't an answering machine or voice mail for leaving messages. The following day Mr. O'Neil called the store and I told him both computers were ready with Office Pro 2003 installed. He arrived at the store the same day, paid the remainder on the invoices in cash and accepted delivery of the computers and software

When I asked Mr. O'Neil why his telephone wasn't answering, he told me that he had dropped his cell phone in the water and it hadn't been working. This seemed unusual because most cell phones have voice mail even when turned off.

Before delivering the computers to Mr. O'Neil, I went over what was included in the custom manufactured computers and provided Mr. O'Neil with the original packaging for the computer and computer software. I reminded Mr. O'Neil that the Office Pro 2003 software was used.

17. Mr. O'Neil never told me he was working for Microsoft or that he was trying to locate sources of alleged counterfeit software. Had Mr. O'Neil done so, I would have assisted him to the best of my ability. For example, we could have reviewed all Microsoft software in inventory and looked for any counterfeits. This also would have helped me because I would then be better informed as to how to detect counterfeit software. We are a family owned business and try to do our part in preserving the integrity of the computer marketplace. Upon numerous occasions employees of L&Y or myself have testified against

persons stealing, selling or attempting to sell computers and software to L&Y.

18. When I found out that Microsoft was accusing L&Y of selling counterfeit software I felt betrayed by Microsoft. I work very hard at trying to avoid installing or selling counterfeits. The problem counterfeits create is that the customer will not be able to seek online support or be able to later upgrade to newer versions. I use and rely upon the Microsoft activation and validation process to make sure only genuine software is sold to customers.

I SOLEMNLY AFFIRM under the penalties of perjury that the contents of the foregoing Affidavit are true and correct.

_____
Matthew Linton

COMMONWEALTH OF VIRGINIA
COUNTY OF Prince William

SWORN TO AND SUBSCRIBED BEFORE ME, this 14th day of July, 2008, by MATTHEW LINTON, who after being sworn, deposes and states that she has executed the foregoing affidavit for the purposes therein stated.

DAVID B. WILKS - NOTARY PUBLIC
County of Prince William
Commonwealth of Virginia
My Commission Expires May 31, 2010
ID# 162049

_____
Notary Public