the operating system for which they are written, Lindows OS presents a notable development in the computer industry and a potential means of broadening consumer options.

Lindows.com plans to release its first commercial version of Lindows OS to consumers sometime in 2002. Robertson Supp. Decl. ¶¶ 3, 5-6. According to Robertson, Lindows OS will be available either by downloading the software directly from Lindows.com servers or by placing an order for a CD-ROM containing the software from the company's web site – www.lindows.com. Id. ¶ 8. The website also indicates that the company has considered selling Lindows OS through OEM and retail channels. See Tessier Decl. Ex. A-4 ("Eventually you'll see computer manufacturers offering systems pre-installed with Lindows OS . . . . If Lindows OS becomes available in a retail environment, subscribers to Lindows.com's mailing list will be the first to know."); see also Tessier Decl. in Supp. of Pla.'s Mot. for Relief from Deadline (online questionnaire about OEM program). Although Lindows.com is enlisting its enthusiasts to help its marketing campaign, see Tessier Decl. Ex. D-1 ("We don't have the billion dollar marketing budget, so your help will be invaluable in getting the word out that there's a new choice emerging on the desktop."), the company has still spent a significant part of its resources, approximately $1.5 million, to promote the Lindows.com and Lindows OS brands. See Robertson Supp. Decl. ¶ 10.

The web site plays a critical role in Lindows.com's planned distribution of the Lindows operating system, id., and it figures prominently in the company's promotional and marketing efforts. At its web site, Lindows.com prominently displays its corporate and product logos, provides links to press reports regarding its Lindows OS product and invites visitors to subscribe to a newsletter mailing list and to email the site directly. See Tessier Decl. Exs. A-1, F-1 to F-41. The web site also encourages visitors to link their websites to the www.lindows.com site by displaying one of several Lindows.com banner advertisements. See id. Exs. C-E. Finally, the Court takes judicial notice that the Lindows.com

ORDER – 10

web site, which at the inception of this litigation contained no disclaimer regarding its affiliation with Microsoft, see Tessier Decl. Exs. A-1 to A-30, now includes the following statement at the bottom of the pages of its web site: "Lindows.com is not endorsed by or affiliated with Microsoft Corporation in any way."

## VI. Microsoft's Requested Remedies

Microsoft's suit under three sections of the Lanham Act and Washington's Unfair Business Practices statute seeks both injunctive and monetary relief. Primarily, it seeks an injunction prohibiting Lindows.com from (1) using the Lindows, Lindows.com or Lindows OS trade names or trademarks in connection with its software or other computer product or service, (2) infringing Microsoft's Windows trademark, and (3) diluting Microsoft's Windows trademark. It also seeks treble damages under the Washington statute and the Lanham Act § 35(a) as well as attorney fees and costs. See Compl. at 10.

**PRELIMINARY INJUNCTION**

The Ninth Circuit applies a sliding scale standard to the showing a party must make to prevail on a preliminary injunction motion. Dr. Seuss Enters. v. Penguin Books USA, Inc., 109 F.3d 1394, 1397 n.1 (9th Cir. 1997). Here, Microsoft must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id. Rather than two separate tests, these points represent the outer reaches of a single continuum in which the requisite showing of harm increases as the probability of success on the merits decreases. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 840 (9th Cir. 2001); Dr. Seuss, 109 F.3d at 1397 n.1. "Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury." Dr.

ORDER – 11

Seuss, 109 F.3d at 1397 n.1 (quoting Big Country Foods, Inc. v. Board of Educ., 868 F.2d 1085, 1088 (9th Cir. 1989)).

## I. Probability of Success on the Merits

### A. Validity of the Mark

Prior to reaching the merits of the three federal trademark causes of action, the Court must determine whether the Windows trademark is a valid, protectable mark. If the term lacks sufficient distinctiveness so that it is generic, "it cannot be the subject of trademark protection under any circumstances." Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, 198 F.3d 1143, 1146 (9th Cir. 1999); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d Cir. 1999) ("Distinctiveness is a crucial trademark concept, which places marks on a ladder reflecting their inherent strength or weakness."); I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998) (holding that distinctiveness is a prerequisite for protection from trademark infringement and dilution).

#### 1. Categories of Distinctiveness

The degree of distinctiveness of a mark is directly related to the breadth of the protection it can command, and trademark law has identified and prioritized four categories of terms with respect to their distinctiveness. In order of decreasing protection, marks can be (1) arbitrary or fanciful, (2) suggestive, (3) descriptive or (4) generic. Filipino Yellow Pages, 198 F.3d at 1146-47 (quoting Surgicenters of America, Inc. v. Medical Dental Surgeries Co., 601 F.2d 1011, 1014 (9th Cir. 1979)). An arbitrary and fanciful term is one which is invented solely for its use as a trademark and is thus afforded the greatest protection. Surgicenters, 601 F.2d at 1015. A suggestive term requires some imagination or perception to determine the nature of the goods, as opposed to a descriptive term which specifically describes a characteristic or attribute of an item or service. Id. at 1014-15. A descriptive term generally does not enjoy trademark protection unless "it has acquired 'secondary meaning' in the minds of consumers, i.e., it has 'become distinctive of the [trademark] applicant's goods in commerce.'" Filipino Yellow Pages,

ORDER – 12