As the Court mentioned earlier, there is only a fine line separating generic and descriptive marks – those which either name a thing or describe a thing. Yet, merely arguing that because a term describes some aspect of a thing it must be descriptive, and hence non-generic, grossly "misunderstands and oversimplifies the inquiry at stake for trademark purposes." Mil-Mar Shoe Co. v. Shonac Corp., 75 F.3d 1153, 1158 (7th Cir. 1996) (finding "Warehouse Shoes" to be generic by focusing on dictionary definitions and third party use). "[A]ssuming that any element of description within a mark automatically precludes that mark from being found to be generic is factually and legally inaccurate . . . ." Id. at 1157. The proper focus of an inquiry into a mark's distinctiveness is whether it is a "kind, sort, genus or subcategory" as opposed to whether it "convey[s] a quality or characteristic of a product." Henri's Food Prods. Co. v. Tasty Snacks, Inc., 817 F.2d , 1303, 1306 (7th Cir. 1987). In Henri's Food Products, the Seventh Circuit addressed whether "tasty" (or "tas-tee") was generic and concluded it was not because it "merely describes the quality of salad dressing." Id. To demonstrate the proper distinctiveness analysis, the court contrasted "French dressing" with "tasty salad dressing." Clearly, "French" represented a kind, subtype or category of dressing, while "tasty" did not. See id.[7] Much like the "French dressing" example, "windows" does not describe a quality of software applications, but rather signifies a "kind, sort, genus or subcategory."

Microsoft also challenges the lengthy list of trademarks, company names, projects and products that use "windows" or some variant of the term in their title. See Reply Mem. at 7. Citing Eclipse Assocs., Ltd. v. Data General Corp., 894 F2d 1114, 1119 (9th Cir. 1990), Microsoft argues that unrelated uses by third parties are irrelevant to trademark infringement analysis. Eclipse is distinguishable on two grounds, however. First, the unrelated uses of the mark were involved in a likelihood of confusion, rather than a validity, analysis. Second, the plaintiff in the case used the mark in relation to computer equipment, while the excluded uses were not related to the computer industry. Here, in contrast, Lindows.com has only offered uses of "windows" within the computer industry, the

---

[7] It goes without saying that the "French dressing" example would also fail the "what are you" test.

ORDER – 25

same consumer market in which Microsoft does business.

### B. Conclusion as to Validity

The volume of evidence required to show, or disprove, the validity of a trademark is not well-suited to the early stages of litigation such as this motion for preliminary injunctive relief. Given the urgency of Microsoft's request for equitable relief, the Court need not at this time make a conclusive determination as to whether the Windows mark is in fact generic. Rather, the Court's role in deciding a motion for preliminary injunction is to evaluate the limited record before it and make a determination regarding the moving party's probability of success on the merits. Because the validity of the Windows mark is a threshold issue upon which all subsequent analysis of dilution, infringement and unfair competition depends, the Court finds that the compelling arguments made by both parties leave it weighing two roughly equal bodies of evidentiary support. As a result, the Court concludes that, at most, Microsoft has raised serious questions about the validity of its trademark, but has fallen short of showing probable success. The Court now turns to the second part of the preliminary injunction analysis, the threat of irreparable injury.

## II. Irreparable Harm

Once the Court has concluded that "serious questions" are raised about the merits, it must determine whether "the balance of hardships tips sharply in favor of the moving party." Stuhlbarg, 240 F.3d at 840. "In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993) (considering the relative size and strength of the parties).

In its briefs, Microsoft relies on the "probability of success" side of the preliminary injunction sliding scale and lets the accompanying presumption of irreparable harm do most of its leg work. See

ORDER – 26

Reply Mem. at 13. It argues that injunctive relief is preferred in trademark violations because monetary damages are often inadequate and that Lindows.com will be unable to afford the presumably large damages award. Lindows OS is not designed to run all Microsoft programs, and it will likely experience defects once it is released, thus tarnishing the goodwill of the Windows mark among confused consumers. Finally, Lindows.com has spent a minimal amount, compared to Microsoft's billion dollar marketing campaign, to promote its brand, and as a newcomer that has intentionally infringed, it cannot complain when its conduct is enjoined.

These arguments fail to show that the balance of the hardships will tip at all, let alone sharply, in Microsoft's favor absent the requested relief. Although Lindows.com certainly made a conscious decision to play with fire by choosing a product and company name that differs by only one letter from the world's leading computer software program, one could just as easily conclude that in 1983 Microsoft made an equally risky decision to name its product after a term commonly used in the trade to indicate the windowing capability of a GUI. The Court finds that these purposeful decisions cancel each other out. Even if Lindows.com has minimal resources to pay a large damages award, Microsoft's focus on injunctive relief as the preferred remedy for trademark infringement indicates that any inability to pay damages is not terribly detrimental to the plaintiff.

Microsoft also argues that its immense expenditures in promoting Windows as well as its multi-billion dollar revenue from these products dwarfs Lindows.com's 1.5 million dollar investment in promoting its Lindows marks. As a result, it stands to lose more from the violation of its trademark rights. In absolute terms, it is hard to argue with the comparison, but Lindows.com's investment also represents a much larger proportion of its resources and investment to date. Further, Microsoft has hundreds of millions of users worldwide. Although it has built substantial goodwill in its Windows mark, there is no concrete evidence that the goodwill will be degraded more than a de minimis amount

ORDER – 27