IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DISTRICT JUDGE GERALD BRUCE LEE
MAGISTRATE JUDGE JOHN F. ANDERSON

MICROSOFT CORPORATION     :
    :
     *Plaintiff,*     :
    :
    :     **CASE NO. 1:08cv00596-GBL-JFA**
v.     :
    :
L & Y ELECTRONICS, INC.,     :
    :
JOHN A. LINTON, and     :
    :
SANGSOON LINTON     :
    :
     *Defendants.*     :

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

COME NOW Defendants, L & Y ELECTRONICS, INC. ("L&Y"), JOHN A. LINTON and SANGSOON LINTON, by counsel, and submit this Memorandum in opposition to Plaintiff Microsoft Corporation's ("Microsoft") Motion to Dismiss Counterclaims [Dkt. No. 17, Filed, August 4, 2008].

### I.    INTRODUCTION – COUNTERCLAIMS OF BREACH OF WARRANTY, ILLEGAL PRICE DISCRIMINATION AND SHAM LITIGATION

Defendants filed as counterclaims, breach of warranty and antitrust violations. As identified in Defendants' pleading, Microsoft antitrust violations include price discrimination and sham litigation.

L&Y Electronics, Inc. ("L&Y") is a licensed Microsoft OEM System Builder that is in the business of respecting Microsoft's intellectual property rights and takes all reasonable steps to ensure that it does not sell infringing software. Some of those steps include using Microsoft's activation software to activate the Microsoft products prior to transferring said products to its

customers. Microsoft claims it purchased non-genuine software from L&Y. L&Y, however, only transferred the software to Microsoft after receiving confirmation from Microsoft's activation process that the product was genuine.

Assuming, *arguendo*, that the software was non-genuine, L&Y has claimed breach of warranty against Microsoft for representations made concerning its activation software and procedures. If the activation software was functioning properly as claimed, then only genuine software would have been transferred by L&Y. If Microsoft's assertions are correct, it necessarily follows that Microsoft's own activation software was defective. L&Y is claiming warranty damages to the extent of being required to defend a lawsuit based upon Microsoft's defective activation software.

Beyond its breach of warranty, Microsoft has implemented price discrimination in an effort to maximize its profits at the expense of small computer stores and small businesses. L&Y has been harmed in excess of $50,000 for Microsoft's illegal and monopolistic price discrimination. Microsoft is also violating Federal antitrust law and Virginia Code Section 59.1-9.6 by bringing "sham" litigation in an effort to curtail and chill resale of used software for the purpose of gaining an unwarranted advantage in the new desktop software market. Microsoft has filed this litigation claiming sales of two counterfeit copies of Microsoft Office Professional Edition 2003 ("Office Pro 2003"). However, Microsoft abandoned Office Pro 2003 in November 2006 when it introduced Office 2007. Microsoft has no financial interest in seeing that only genuine copies of Office Pro 2003 are resold. Rather, Microsoft's interest lies in removing Office Pro 2003 from the used software marketplace and forcing the public to purchase new copies of Office 2007.

Unfortunately for consumers, Office 2007 is not compatible with most personal computers. In order to install and effectively use Office 2007, most users will be required to upgrade to new computer hardware. In addition, the operation and controls of Office 2007 have

been materially changed in comparison to Microsoft's former office products.  Not only does

Office 2007 require end users to change computers, it requires the expenditure of significant time

and effort in learning the new controls.  Forcing consumers to switch to Office 2007 is good for

Microsoft's revenues (now reaching $60 Billion) but not for the public and not for businesses

such as L&Y who deal in used software.

      Contrary to Microsoft's inflammatory remarks, L&Y does not condone or engage in the

sale of counterfeit software.  L&Y takes what reasonable steps are available to avoid the

dissemination of counterfeit software.  L&Y fully cooperates with manufacturers and law

enforcement to aid and assist removing illegal and counterfeit software from the marketplace.

L&Y met with Microsoft's representative, Michael Fuller in 2007 and requested assistance in

detecting and avoiding counterfeits.  Mr. Fuller confirmed that L&Y was following best

practices and could not suggest any improvements.

II.     RULE 12 (b)(6) – STANDARD FOR DISMISSAL

      It is not proper for a court to grant a motion to dismiss for failure to state a claim unless it

appears that no relief could be granted under any set of facts that could be proved consistent with

the allegations. *Hisbon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Estate Constr. Cc. v. Miller*

*& Smith Holding Co.*, 14 F/3d 213, 217 (4th Cir. 1994).  The function of a motion to dismiss is

to test the sufficiency of the complaint, not to resolve contested facts, the merits of the claim or

the applicability of defenses. *Republican Parry of North Carolina v. Martin*, 980 F.2d 943, 952

(4th Cir. 1992); *Gasner v. County off Dinwiddie*, 162 F.3D. 280, 281 (S.D. Va. 1995).  While the

court must assume that factual allegations in the complaint are true, it need not assume that a

plaintiff "can prove facts that [are] not alleged or that the defendants have violated the ... law in

ways that have not been alleged." *Estate Construction Co. v. Miller & Smith Holding Co.*, 14

F.3d 213, 221 (4th Cir. 1994) (quoting *Associated General Contractors v. California State*

*Council of Carpenters*, 449 U.S. 519, 526 (1983)).

III.   BREACH OF WARRANTY COUNTERCLAIM IS SUFFICIENTLY PLED
       AND SUPPORTED WITH PLED FACTS

Microsoft admits that it has been given adequate notice of the breach of warranty

counterclaim and the factual bases for it.  Microsoft's only argument for dismissal is that

counterfeit software does not include any warranty from Microsoft.  This argument fails for two

reasons: (1) there is a genuine issue of material fact as to whether or not the subject software was

actually counterfeit and (2) the breach of warranty includes representations made by Microsoft,

its agents and employees.

A.      *Defendants aver that the software sold to Microsoft was genuine*

L&Y does not sell counterfeit software.  To the contrary, L&Y goes to great lengths to

avoid selling counterfeits.  According to press releases from Microsoft, software counterfeiting

and piracy has plagued Microsoft products for years.  In response, Microsoft added a product

activation procedure for its 2003 and other products.  If a purchaser attempts to activate a

counterfeit, he is given an error message indicating the software is not genuine.  L&Y uses and

relies upon the activation process to ensure that only genuine software is transferred to its

customers.

In this litigation, Microsoft asserts that it purchased two copies of counterfeit software

from L&Y.  Microsoft further argues that because the software was counterfeit, no warranties

attach.  L&Y, however, avers by affidavits that the software was genuine and Microsoft's

activation process and/or software verified that both copies were genuine.  Microsoft, in support

of its motion to dismiss argues that no warranties attach to counterfeit software.  Whether or not

the software that is the subject of this suit is counterfeit is a factual dispute.  To date, Microsoft

has not presented any basis supporting its bald assertion that that the software was counterfeit.

No expert reports have been presented.  No details of how or why Microsoft believes the

software was not genuine have been presented.  Microsoft has not made its initial Rule 26(a) disclosures.  No chain of custody has been identified.  Based upon the present procedural posture of this case and the body of facts alleged and supported, at a minimum, there is a material issue of fact whether or not the software was genuine.  Accordingly, Microsoft's argument should fail procedurally upon a motion to dismiss.

> **B.**   *Assuming Microsoft can establish that the software was infringing, it has breached its warranties as to its activation software*

Microsoft's argument for dismissal of the breach of warranty does not address the defects in its activation process and/or software.  Defendants alleged a contractual relationship with Microsoft under both the End User License Agreement ("EULA") and OEM System Builders License Agreement.  (Answer, paragraphs 67-69).  The EULA, a copy of which was attached to the Affidavit of John Linton, expressly directs parties to the website: www.microsoft.com/piracy/howtotell.com to identify whether or not software is genuine.  In addition, and also as outlined in Mr. Linton's Affidavit are verbal representations made by Microsoft's employee and/or agent, Michael Fuller.  Mr. Fuller expressly represented to Mr. Linton that the only way to verify authenticity was through an inspection of the software packaging and the activation procedures on the "howtotell" website.

L&Y relied upon these representations and verified the appearance of the software sold to Microsoft in addition to activating it through Microsoft's own activation process and/or software.  During the activation process, the "howtotell" website is accessed, the software product number along with a security key are typed in.  A hash total that is based upon the computer identification number is uploaded to the website.  Based upon the entries and hash total, Microsoft's activation responds with a message that the software is either genuine or infringing.

The undisputed facts are that L&Y used the activation on both copies of the allegedly counterfeit software and that L&Y did not transfer software identified through Microsoft's

activation process as counterfeit. L&Y brings a breach of warranty claim as to Microsoft's express and implied representations that its activation process and/or software would detect non-genuine software. But for the deficiencies in Microsoft's activation process and/or software, L&Y would not incur the expense of defending an infringement lawsuit.

As defendants have adequately noticed Microsoft as to the basis of their breach of warranty counterclaim and as there remains material issues of facts surrounding whether or not the software in question was counterfeit, Microsoft's motion to dismiss this counterclaim should be denied. Finally, even assuming *arguendo*, that Microsoft requires additional clarification of this counterclaim, it would be appropriate for the Court to permit Defendants to amend and/or replead the claim pursuant to Federal Rule of Civil Procedure 15.

IV.    PRICE DISCRIMINATION VIOLATES ANTITRUST LAW

       *A.*    *Unreasonable control of a product and pricing discounts constitute price Discrimination*

Any person considering the purchase of Microsoft products quickly realizes that Microsoft engages in price discrimination. Price discrimination attempts to get purchasers willing to pay more to do just that – pay more. This maximizes profits to the seller. In this case, Microsoft sells its products at different prices to schools, students, large volume users, computer manufacturers, large volume retailers and distributors. The highest prices are reserved for small businesses.

Notwithstanding Microsoft's argument that it can offer unreasonable discounts for "volume purchases," it cannot engage in price discrimination. Both Federal and Virginia law disallow this type of improper price-discrimination.

Virginia Code Section 59.1-9.7 prohibits price-discrimination:

       § 59.1-9.6. Contracts, etc., in restraint of trade unlawful.

Every conspiracy, combination, or attempt to monopolize, or monopolization of, trade or commerce of this Commonwealth is unlawful.

§ 59.1-9.7. Discriminatory practices unlawful; proof; payment or acceptance of certain commissions, etc., unlawful.

(a) It is unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities or services of like grade and quality, where either or any of the purchasers involved in such commerce are in competition, where such commodities or services are sold for use, consumption or resale within the Commonwealth and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them; provided, that nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the different methods or quantities in which such commodities or services are to such purchasers sold or delivered; and provided further, that nothing herein contained shall prevent persons engaged in selling commodities or services in commerce from selecting their own customers in bona fide transactions and not in restraint of trade; and provided further, that nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as, but not limited to, actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

(b) Upon proof being made, at any suit on a complaint under this section, that there has been discrimination in price or services or facilities furnished or in payment for services or facilities to be rendered, the burden of rebutting the prima facie case thus made by showing justification shall be upon the person charged with a violation of this section; provided, however, that nothing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

Similarly, Federal law prohibits price discrimination:

15 U.S.C. Sec. 13. Discrimination in price, services, or facilities

(a) Price; selection of customers

It shall be unlawful for any person engaged in commerce, in the course of
such commerce, either directly or indirectly, to discriminate in price
between different purchasers of commodities of like grade and quality,
where either or any of the purchases involved in such discrimination are in
commerce, where such commodities are sold for use, consumption, or resale
within the United States or any Territory thereof or the District of Columbia
or any insular possession or other place under the jurisdiction of the United
States, and where the effect of such discrimination may be substantially to
lessen competition or tend to create a monopoly in any line of commerce, or
to injure, destroy, or prevent competition with any person who either grants
or knowingly receives the benefit of such discrimination, or with customers
of either of them: Provided, That nothing herein contained shall prevent
differentials which make only due allowance for differences in the cost of
manufacture, sale, or delivery resulting from the differing methods or
quantities in which such commodities are to such purchasers sold or
delivered: Provided, however, That the Federal Trade Commission may,
after due investigation and hearing to all interested parties, fix and establish
quantity limits, and revise the same as it finds necessary, as to particular
commodities or classes of commodities, where it finds that available
purchasers in greater quantities are so few as to render differentials on
account thereof unjustly discriminatory or promotive of monopoly in any
line of commerce; and the foregoing shall then not be construed to permit
differentials based on differences in quantities greater than those so fixed
and established: And provided further, That nothing herein contained shall
prevent persons engaged in selling goods, wares, or merchandise in
commerce from selecting their own customers in bona fide transactions and
not in restraint of trade: And provided further, That nothing herein
contained shall prevent price changes from time to time where in response
to changing conditions affecting the market for or the marketability of the
goods concerned, such as but not limited to actual or imminent deterioration
of perishable goods, obsolescence of seasonal goods, distress sales under
court process, or sales in good faith in discontinuance of business in the
goods concerned.

At issue in this case is whether Microsoft has engaged in price discrimination to an extent

unjustified by its costs of manufacture, sale or delivery.  This improper price discrimination

prevents small computer stores from competing with Dell Computer and large retailers.[1]

L&Y alleges that Microsoft's price discrimination has caused it to lose in excess of

---

[1] Discounts to Dell Computer are noteworthy and have been identified in Defendants' Answer,
Affirmative Defenses and Counterclaims.  According to Microsoft's annual report for 2007, Dell

$50,000 of operating profits (Answer, paragraph 119). L&Y further claims that Microsoft sells the same products to competitors at an unjustified discount (Answer, paragraphs 89, 114). Dell Computer ("Dell") is a corporation that sells its products in interstate commerce. As a direct and proximate result of Microsoft's unjustified discounts to Dell, Dell sells Microsoft products below the wholesale price L&Y pays to its Microsoft distributor, D&H Distributing. (Answer, paragraphs 90, 115).

L&Y has pled sufficient facts to show antitrust injury (price discrimination) similar to those found in the case of *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 110 S.Ct. 2535, 110 Led.2d 492 (1990). In *Texaco, Inc.*, the producer (Texaco) sold its product to large volume purchasers at unjustified discounts. Texaco argued that the discounts were justified due to (1) the large volume purchasers were a different type of customer, *i.e.* distributors and (2) the large volume purchasers performed delivery services when they picked up the product from Texaco's production location. The United States Supreme Court rejected both of Texaco's arguments. The Court affirmed the ruling of the court of appeals that the discount amounts were unjustified on functional or cost grounds and constituted price discrimination in violation of 15 U.S.C. § 13(a).

In this case, Defendants have provided factual allegations that Microsoft offers unjustified price dicounts to Dell and others. Based upon these facts, which in many ways resemble those in *Texaco, Inc.*, Defendants have given notice to Microsoft of the existence of a *prima facie* case of price discrimination.

---

Computer purchases 10 to 11% of Microsoft's personal computer software. Those discounts are not justified by Microsoft's costs of manufacture and distribution.

### V.   MICROSOFT SHAM LAWSUITS ALSO VIOLATE ANTITRUST LAW

Defendants' counterclaim for antitrust violations also includes Microsoft's use of litigation to monopolize the marketplace and stifle sales of used software[2] (Answer, paragraph 117).  Microsoft correctly responds that the *Noerr-Pennington* doctrine must be considered in this context.

Microsoft asserts that its anticompetitive conduct in the form of initiating litigation is immune from an antitrust claim under the *Noerr-Pennington* doctrine unless the lawsuit is sham litigation (Microsoft Memo in Support of Motion to Strike, pages 7-8).  This assertion fails because the *Noerr-Pennington* doctrine provides immunity from tort claims only when the lawsuits are not sham litigation.

The label "sham" is appropriately applied to lawsuits in which "the plaintiff is indifferent to the outcome of the litigation itself, but has nevertheless sought to impose a collateral harm on the defendant..." *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 at 68, Justice Souter concurring opinion (1993).

Here, Defendants present factual allegations that this lawsuit (and others like it) constitutes sham litigation.  Microsoft is indifferent to the outcome of the litigation because it has abandoned Office Pro 2003 as a product.  (Answer, paragraphs 24, 36, 45, 72, 74, 82, 83,117).  Microsoft is indifferent to preventing infringement of Office Pro 2003 because it no longer manufactures, markets or sells Office Pro 2003 (Answer, paragraph 72).  Instead Microsoft's motivation as plead, is to stifle the resale of used Office Pro 2003 (Answer, paragraphs 76-78).  By eliminating Office Pro 2003, end users will be forced to adopt the inferior Office 2007 (Answer, paragraphs 72-74).  Microsoft has adopted the tactic of filing sham litigation against small computer businesses that resell used software to stifle resale of Office Pro 2003 (Answer,

---

[2] Monopolization is prohibited under both the Sherman Act and the Virginia Antitrust Act.

paragraph 74, 78).  The purpose of Microsoft initiating the litigation is to harm the reseller of used software and not to prevent infringement of an abandoned product (Answer, paragraph 78, 117, 118).

Not only is Microsoft bringing this lawsuit as sham litigation, it has no objective basis in believing it will prevail upon all of its statutory and common law claims.  The bulk of its trademark registrations are inapplicable based upon the facts as alleged in the Complaint.  Registrations limited to printed manuals and magnetic disks have no relevance to software sold without printed manuals on compact discs[3] (*See,* Answer, paragraph 10).  Further, the trademark "Windows" has previously been adjudicated unenforceable because it is a generic term.  *See, Microsoft Corp. v. Lindows, Inc.*  Notwithstanding, these deficiencies, Microsoft continues to pursue enforcement in this and other similar litigation.

Microsoft's claims for copyright infringement are equally without merit.  Microsoft has no legitimate copyright interest in an abandoned product.  The grant of a copyright is to ensure that the author is compensated and given credit for its original creative work.  Microsoft no longer manufactures or sells Office Pro 2003 and can claim no legitimate interest in enforcing its monopoly granted by copyright.  As argued in Defendants' opposition to Microsoft's motion to strike the defense of copyright misuse, Microsoft would have a valid claim if it resumed the production and/or sale of Office Pro 2003.  Until that occurs, and in accordance with the Fourth Circuit's doctrine of copyright misuse, Microsoft cannot claim any enforceable copyright interest in its abandoned product.

---

[3] Compact discs are optical rather than magnetic storage media.

Microsoft agues here, as it did in *U.S. v. Microsoft, Corp.*, 253 F.3d 34 (D.C. Cir. 2001) that it is entitled to unrestricted control over its own intellectual property.  The court in *Microsoft, Corp.* disagreed, finding that Microsoft placed unjustified licensing restrictions on internet browser products:

> Microsoft's primary copyright argument borders upon the frivolous. The company claims an absolute and unfettered right to use its intellectual property as it wishes: "[I]f intellectual property rights have been lawfully acquired," it says, then "their subsequent exercise cannot give rise to antitrust liability." Appellant's Opening Br. at 105. That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability. As the Federal Circuit succinctly stated: "Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).
>
> *U.S. v. Microsoft, Corp.*, 253 F.3d at 63.

In this case, Microsoft is misusing its intellectual property rights as the "baseball bat" to secret Office Pro 2003 from the public (Answer, paragraph 72, 77).  Bringing litigation in order to stifle competition violates antitrust law.  *Noerr-Pennington* provides no immunity from antitrust claims when the litigation is sham litigation or contains claims that are objectively baseless.

## VI.   DEFENDANT L&Y HAS STANDING TO BRING ANTITRUST CLAIM

### A.   *Antitrust Standing Must be Considered Under the Particular Facts and Circumstances of Each Case*

Microsoft contends that Defendants' antitrust claim must be dismissed because Defendants lack standing to bring an antitrust suit in that they "have not suffered a direct legitimate competitive injury." (Memorandum in Support of Dismissal, page 9)  However, Section 4 of the Clayton Act contains broad language as to who may bring a private antitrust claim:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover

threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. 15 US.C. § 15

Virginia law has a similar provision:

§ 59.1-9.12. Personal suit for injunction or actual damages –

(b)  Any person injured in his business or property by reason of a violation of this chapter may recover the actual damages sustained, and, as determined by the court, the costs of suit and reasonable attorney's fees.  If the trier of facts finds that the violation is willful or flagrant, it may increase damages to an amount not in excess of three times the actual damages sustained.

The United States Supreme Court has sought to restrict application of the broad Federal statutory language by ruling: "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, ("*AGC*") 459 U.S. 519 at 534 (1983) ("*AGC*").  The Fourth Circuit considers up to five factors in determining whether a claimant is so far removed from the antitrust harm "that the wrongdoer should not be held liable."  Claimants too far removed are said to lack standing.  These antitrust standing factors are enumerated in *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 at 311 (4th Cir., 2007):

(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended;

(2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws;

(3) the directness of the alleged injury;

(4) the existence of more direct victims of the alleged antitrust injury; and

(5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

(quoting *Kloth v. Microsoft*, 444 F.3d 312 at 324 (4th Cir.2006))

No one factor is determinative.  Courts are instructed to "analyze each situation in light of the factors" (*AGC*, Footnote 33) to "make a further determination whether the plaintiff [claimant] is a proper party to bring a private antitrust action" (*AGC*, Footnote 31).  Due to "the infinite variety of claims that may arise [in antitrust claims] make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *AGC*, 459 U.S. at 536.  Microsoft has previously argued that the factors should be applied in a black-letter prerequisite basis.  This argument, however, has been rejected as the law of the Fourth Circuit (See *Novell*, 505 F.3d at 311-315).

This Court has summarized that antitrust standing is proper when but a single factor is satisfied:

> When a party intentionally engages in anticompetitive activity against specific parties, the victims have standing to sue the violator. The requirements of antitrust injury clearly are satisfied, giving the victims standing to bring treble damage actions. *Haigh v. Matsushita Elec. Corp. of America*, 676 F.Supp. 1332 at 1345 (E.D. Va., 1987)

    B.    *Under the Novell Factors (and Haigh ruling), Defendants Have Pled Sufficient Facts to Establish them as Proper Claimants in a Private Antitrust Action*

In this case, Microsoft contends that Defendants' antitrust claim must be summarily dismissed because Defendants lack standing to bring an antitrust suit.  To the contrary, Defendants have adequately pled and satisfied all of the factors enumerated in *Novell*.

Factor One: As a result of Microsoft's price discrimination, L&Y is unable to compete in the sale of new computers (Answer, paragraphs 102, 105, 106, 114, 115, 119).  In addition, and as a result of Microsoft's filing of sham litigation, L&Y has sustained harm by incurring the cost of defense for selling Microsoft's used abandoned software (Answer, paragraphs 76, 117).  Microsoft does not refute that the harm was intended in both instances as alleged (Answer, paragraph 116).

Factor Two: The injuries alleged by Defendants restrain competition between Dell Computer and resellers of used computer hardware and software (Answer, paragraphs 102, 115, 119; John A. Linton Affidavit, paragraphs 9-11). These injuries restrain competition between used software such as Office Pro 2003 and new software such as Office 2007 (Answer, paragraphs 24, 74, 77, 81, 83, 117, 120). Further, these are injuries to competition that the antitrust laws were intended to forestall (*Novell*, 505 F.3d at 316).

Factor Three: Price discrimination practiced by Microsoft directly affects L&Y and prevents L&Y from purchasing Microsoft products at prices similar to those offered to Dell and others (Answer, paragraphs 90, 102, 115). Microsoft has filed its sham litigation directly against Defendants for selling Microsoft abandoned products (Answer, paragraphs117, 120). Price discrimination has caused L&Y to be injured in the amount of $50,000 (Answer, paragraph 119).

Factor Four: L&Y is the direct victim of Microsoft's predatory price discrimination practices (Answer paragraphs 119, 120; John A. Linton Affidavit, paragraphs 9-11). As compared to other potential plaintiffs, L&Y is the most direct victim. It is unlikely that any other party would or could claim that he or she sustained injury because L&Y has been and is unable to compete in new software sales with Dell and other volume sellers receiving unjustified discounts. Notably in its memorandum, Microsoft has not identified any more direct victim.[4]

Factor Five: L&Y has estimated lost profits in the amount of $50,000 or more and has been the target of legal attacks by Microsoft (Answer, paragraphs 119, 120). In cases where Microsoft's allegedly anticompetitive conduct is directly aimed at a claimant, then that claimant is a proper party for private antitrust claims. *See, Novell* 505 F.3d at 319. As to proof of profits, the United States Supreme Court has recognized that antitrust damages need not be proven

---

[4] In *Novell* a similar lack of other more direct victims was noted, "Given the apparent absence of a more-directly harmed party than Novell [claimant]… we conclude that the AGC directness factors weigh in favor of finding antitrust standing," *Novell* at 505 F.3d 319.

precisely and that antitrust claimants are excused from "an unduly rigorous standard of proving antitrust injury." *See* the price-discrimination case of *Texaco Inc v. Hasbrouck*, 496 U.S. 543 at 573 (1990).

Considering all five *Novell* factors in addition to taking Defendants alleged facts as true for the purpose of a motion to dismiss, Defendants have pled sufficient bases for private party antitrust standing. L&Y is a direct victim of Microsoft's anticompetitive price discrimination. Defendants are directly subject to Microsoft's sham litigation. No other more direct victims have been identified. Anticompetitive conduct to eliminate small computer stores as competitors with Microsoft's preferred vendors (*e.g.* Dell Computers) is the type of conduct the Clayton Act seeks to prevent. Similarly, anticompetitive conduct directed to chill legitimate resale of copyrighted works under 17 U.S.C. 109(a) (with the result that Microsoft can extract higher prices for its new products such as Office 2007) is also the type of conduct the Clayton Act and Robinson-Patman Act seek to prevent.

### C. *Virginia May Impose An Alternate Standing Requirements*

Due to the broad language of Virginia Code Section 59.1-9.12, Virginia may apply some, all or none of the *Novell* factors in making a Virginia antitrust standing ruling. Microsoft relies upon the Federal District Court of Western Virginia for authority that a Virginia antitrust standing is the same as Federal antitrust standing (See Memo, page 14 relying upon *Va. Vermiculite, Ltd. V. W.R. Grace & Co*. (W.D. Va. 1997). While Virginia may have a tendency to follow some of the Federal precedent, they are not required to do so as to standing. Microsoft presents no dispositive authority that Defendants lack standing to bring a Virginia antitrust action in accordance with Virginia Code 59.1-9.12.

## VII.   ANTITRUST CLAIM HAS FACTUAL BASIS FOR RELIEF AND IS SUFFICIENTLY PLED

### A.   *Allegations of Price Discrimination Present Facts Sufficient to Survive a Motion to Dismiss*

Upon a motion to dismiss, all facts as pled must be deemed as true.  Defendants have asserted with specificity that Microsoft offers unjustified and quantifiable price discounts to volume retailers such as Dell, Hewlett-Packard and others.  Microsoft makes the blanket assertion that it has the absolute right to control its intellectual property rights and the reproduction and distribution of its products.  (Memorandum in Support of Dismissal, page 10)  To support its position, Microsoft cites the non-binding authority of *Microsoft Corp. v. Computer Support Services of Carolina, Inc.,* 123 F. Supp.2d 945 (W.D.N.C. 2000) ("*Computer Support Services*")[5]  *Computer Support Services* may be distinguished from the present case.  In *Computer Support Services*, the magistrate judge granted a motion to dismiss allegations of illegal monopoly and tying arrangements.  The allegations were not supported by affidavits or other pled facts and did not identify specific injury to the counter-plaintiff.  In this case, Defendants have provided numerous facts supporting illegal price discrimination, namely, Microsoft sells software to Dell at approximately one-fifth of the price Defendants can purchase the same product from Microsoft's authorized distributor; this price differentiation is not related to Microsoft's cost of manufacture and has prejudiced and prevented Defendants from competing with manufacturers such as Dell and as a result, Defendants have sustained damages in the form of lost profits of approximately $10,000.00 per year for the past five years.  (Affidavit of John Linton, paragraphs 9-11).

Also what distinguishes the facts in the instant case is that Microsoft has abandoned

---

[5] As discussed in Defendants' Memorandum in Opposition to Motion to Strike Defendants' Fourth, Fifth, Eighth and Ninth Defenses, Computer Support Services is readily distinguishable from both the facts and procedural posture of this case.  (*See*, Memorandum Section VI, b)

Office Pro 2003.  Defendants assert, as part of their antitrust counterclaim that Microsoft is secreting and unreasonably restricting its intellectual property and is using litigation to accomplish that end.  Whether or not Microsoft's restriction is permissive or violative of Federal and Virginia antitrust law is a mixed question of fact and law and is not a matter to be decided upon a motion to dismiss.  Defendants have pled sufficient facts as a matter of law and for the purposes of Federal Rule 8.

Finally, and as discussed *supra*, prohibited antitrust conduct includes using price discrimination to reduce the ability of small businesses to compete with wholesalers that also sell retail (*e.g.* Dell Computer).  *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 110 S.Ct. 2535, 110 L Ed.2d 492 (1990).

### B.    Antitrust Counterclaim is sufficiently Pled

Defendants claim antitrust injury from being forced out of the new computer market due to Microsoft's discriminatory pricing.  With specificity they identify a number of competitors who are sold Microsoft products at prices too low to be justified by costs of manufacture, sales and delivery.  L&Y has placed an estimate upon the amount of lost profits that have causally resulted.  Defendants have given Microsoft notice of the nature of the antitrust claim. Defendants have identified the factual basis for price discrimination.  In short Defendants have properly stated a claim for antitrust injury of price discrimination.

Defendants have also stated a claim for antitrust injury associated with being forced to defend a sham lawsuit.  Microsoft has no interest in the outcome of used software litigation for its abandoned products.  Microsoft's purpose and intent is to deprive the public of older versions of its software.  Not only is the public deprived of the older and as many would say, better versions, but also the older computers need the older software.

VIII.   LEAVE TO AMEND FOR THE PURPOSES OF CLARIFYING TECHNICAL ELEMENTS IS APPROPRIATE.

Microsoft asserts that Defendants have not pled with the requisite specificity certain formal elements of an antitrust claim.  Although Defendants believe they have in substance, if not in form, identified the necessary elements, liberal leave to clarify and/or amplify any alleged deficiencies is appropriate and permitted by Federal Rule of Civil Procedure 15.  Defendants have identified that Microsoft enjoys a monopoly power in computer software and that Microsoft controls pricing in that market (Answer, paragraphs 101-9; 114-20 and Affidavit of John Linton, paragraphs 9-11); Defendants have pled that Microsoft is attempting to maintain and/or expand its monopoly power not through a superior product, *i.e.*, Office 2007, but by removing Office Pro 2003 from the marketplace.   In the alternative, in the event the Court finds it to be necessary, Defendants request leave to amend for the purpose of amplifying their pleading and clarifying technical elements, if any.

IX.     CONCLUSION

Defendants' averments and factual allegations for both of their counterclaims are legally sufficient.  Microsoft has been give sufficient notice of the nature and basis for these claims. Defendants have adequately provided notice to Plaintiff of the nature and factual allegations for their counterclaims.  As such, Plaintiff's motion to dismiss under Rule 12 (b)(6) should be denied.  Defendants further request, in the alternative, that should the Court grant any relief requested by the Plaintiff, that they be given leave to amend for the purpose of further amplifying their counterclaims pursuant to Federal Rule of Civil Procedure 15.

Respectfully submitted,

_____/s/_____
Jenine Elco Graves, Esq.
Virginia State Bar No. 44877
Co-counsel for Defendants
QUINTO & WILKS, P.C.
3441 Commission Court
Lake Ridge, Virginia 22192
Phone: 703-492-9955
Fax: 703-492-9455
jgraves@quintowilks.com

_____
Timothy W. Graves, Esq.
Virginia State Bar No. 45414
Co-counsel for Defendants
A ATTORNEY LLC
9300 Grant Avenue, Suite 203
Manassas, Virginia 20110
Phone: 703-365-8306
Fax: 703-365-8307
a-atty@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that on this ___15th___ day of August, 2008, I will electronically file the foregoing Defendants' Memorandum in Opposition to Plaintiff's Motion to Dismiss Counterclaims with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

John K. Roche, Esq.
Counsel for Plaintiff
PERKINS COIE, LLP
607 Fourteenth Street, N.W., Suite 800
Washington, D.C. 20005
Phone: 202-434-1627
Fax: 202-654-9106
jroche@perkinscoie.com

Respectfully submitted,

_____/s/_____
Jenine Elco Graves, Esq.
Virginia State Bar No. 44877
Co-counsel for Defendants
QUINTO & WILKS, P.C.
3441 Commission Court
Lake Ridge, Virginia 22192
Phone: 703-492-9955
Fax: 703-492-9455
jgraves@quintowilks.com

_____
Timothy W. Graves, Esq.
Virginia State Bar No. 45414
Co-counsel for Defendants
A ATTORNEY LLC
9300 Grant Avenue, Suite 203
Manassas, Virginia 20110
Phone: 703-365-8306
Fax: 703-365-8307
a-atty@verizon.net